Macay, Taylor, and Locke, Judges.
—The circumstances of this case are somewhat singuiar, and as the questions it involves, have not formed the subject of any judicial decesion, that is recollected, in this State, it may be useful to state the principle of law, as we apprehend them, with some degree of minuteness. For, when the grounds of a decesion are precisely ascertained, *501 there is less danger of the misapplication of its authority as a precedent, or of its extension to cases, which do not, according to just analogy, range within its instance.
It is a fact stated in the record, that William Howell was an idiot. As such he was incapable of giving that free and deliberate assent, which forms the essence of a contract; and the law has declared, that all deeds, not of record, made by persons labouring under this mental infirmity, with a view to transfer their property, real or personal, are absolutely void. The exception, as to deeds of record, can have no operation in this State, where there is no method of levying a fine or suffering a recovery. The plaintiff right to shew the incapacity of his interstate, cannot be disputed, for privies in blood, as the heir, may shew the disability of the ancestor, and privies in representation, as the administrator, that of the interstate. 4 Co. 124. The law will therefore permit the plaintiff's recovery, unless he is barred by the deed with warranty, executed by his wife, when sole, to the defendant. If is however an additional circumstance in the case, that the wife of the plaintiff was under a similar disqualification with her brother, to make a deed: The question therefore to be considered are,
1 ft. Whether the husband may shew the idiocy of his wife before coverture, in order to avoid her deed?
2nd. Whether the husband is barred by the warranty of die wife, under the circumstances of the case?
*502 Previously to considering the first question, ’t may be premised that, the terms " idiot " and " insanity,” ;u indiscriminately applied to the wife, in the cafe lent up; though, if by the latter, be meant lunacy, a material legal difference exists between them. An idiot is one that hath had no understanding from his infancy, therefore is by law presumed never likely to attain any. 1 Bl. 302. A lunatic is one who hath had understanding, but by disease, grief, or other accident, hath loft the use of his reason. A lunatic is, indeed properly, one that hath lucid intervals; sometimes enjoying his series, and sometimes not. Ibid. 304. The fame writer lays down the principle, that consent is absolutely necessary to matrimonial contracts,and neither idiots nor lunatics are capable of consenting to anything. Ibid. 438. It is presumed, however, that the meaning or this passage is, that the former are incapable of consenting at all times, but that the latter may consent m a lucid interval, and consequently, can, in that state, contract matrimony; for the writer proceeds to observe, “ And modern authorities have adhered to the reason of the civil law, by determining that the marriage of a lunatic, not being in a lucid interval, was absolutely void.” But as the validity of Sarah Howell’s marriage is not made a question upon the record, and as the equivocal use of the terms preclude any precise inference, no opinion will be given on that point. These remarks are therefore made only with the view of shewing that the circumstance has not been overlooked; and to explain, what might, on a flight examination of the case, be construed as giving an implied function to the marriage of a person *503 legally disqualified. With respect to the question itself, the maxim relied upon is, that no man shall be suffered to stultisy himself, in support of which so many cases have been cited and referred to, as strongly tend to create a belief, that the current of authorities sets that way. As a rule of law established by many adjudications, we do not mean to infringe it, but in our view of this cafe, it becomes necessary to examine the foundation on which it rests, in order to shew that neither the authority of the cafes, nor the immutable principles of justice, warrant its further extension, or more rigorous application. No rule is more clearly deducible from natural justice, than that an obligatory contract cannot be made by a person devoid of understanding to direct his actions. Freedom and intelligence constitute a moral agent, without which faculties, a person is incapable of producing by his acts, any moral effect. Infants, idiots, and madmen, are equally unendowed with this moral agency, and are con-fequently alike incapable of making a valid contract, This principle is received into the code of all civilized nation*. It is even admitted, in its full force, by our law, which however creates an artificial distinction between the modes in which the contrails of incompetent persons are to be nullified. An infant may alledge and prove his infancy; a non compos cannot do so, because, fay the books, great insecurity would arise to contrails, from counterfeit madness and folly; and, supposing it to be real, a man cannot know what he did in such a situation. Influenced alone by such reasoning, the law has continued to enforce the maxim down to a late period, from the time of Edward 3d. Before the latter period however, the adjudications were directly oppo *504 site. This is rendered manifest by the Registrum Brevium, in which there is a writ for the alienor to recover lands conveyed by him, while he was pf unfound mind; by the authority of Britton, who asserts that a man might alledge his own insanity; and by that of Fitzherbert in his Natura Brevium, whose words are so emphatical as to leave no doubt of his real opinion of the law at the time he composed his book. " It stands with " reason that a man should shew how he was vi- " sited by the act of God with infirmity, by which " he lost his memory and discretion for a time. " As if an infant within the age of twenty-one " years, doth make a seossment in see or a lease " for years, he himself shall avoid his seossment " or lease, as well within age, although he shall " not have a dum suit infra ætatem within age, " because the writ doth suppose him to be of full " age; but an infant of the age of fourteen years “ hath discretion, as hath been adjudged, at such " age; and if he at such an age commit felony, " he shall be hanged for the fame, and yet his " seossment lease or grant shall not bind him be- " fore the age of twenty one years, because he " hath not perfect discretion or knowledge of what " he ought to do, or what is to his profit or ad- " vantage before such age; and therefore he shall " alledge, that he was within age at the time of " the seossment, grant or lease made by him; by " which it appeareth, that he shall alledge, that " he had not perfect discretion at that time, for " that non age is an infirmity of nature,and cometh " by the act of God; and a fortiori, then, he " who is of non sane memory, shall alledge, that " he was not of sane memory at the time of his " seossment or grant; for he who is of unfound " memory hath not any manner of discretion, &c."
*505 The degree of credit to which these books are entitled, may be belt estimated considering what is their character and pretensions, and we, can thus more fairly draw a companion between them and the others by which they are contradicted. The first book cited, is supposed by some writers to be the oldest in the law, and must at least be considered as containing true precedents of such writs as were used at the time of its publication. It was printed, probably for the first time, in the year 1531, about sixty years after the art of printing was introduced into England, and may perhaps be considered as good evidence of what the law then was, as the loose dicta to be collected from the year books. Britton is a writer highly esteemed, considering the period in which he wrote, and has the reputation of conveying the doctrines of the law in a precise and satisfactory manner, It is almost supersluous to remark of Fitzherbert, that he was a profound and accurate judge; whose laborious and intelligent researches, in the time of Hen.viii, imparted methodical arrangement and luminous order to many branches of the law. His work, from which the above extract is made, contains a selection of such writs from the Registrum Brevium, as had not become absolute in his time. For the particular doctrine he advances relative to this case, he is warranted by the authorities he cites; and although he has since been overruled in Stroud vs. Marshall, Cro. Eliz, 398, yet his reasoning still retains whatever cogency it originally possessed. Having been sanctioned by some of the greatest modern lawyers, it cannot be considered altogether inconclusive. Judge Blackstone observes thus, “ And from these loose au- *506 “ thorities, which Fitzherbert docs not seruple “ to reject as contrary to reason, the maxim “ that a man shall not stultisy him fell, hath been “ handed down as settled law; though later opi- “ nions feeling the inconvenience of the rule, have “ in many points endeavoured to restrain it.” Vol. 1. Pa. 191. No direct judicial decision, confirmatory of the maxim, hath occurred of a later date than Jac. 1. nor is it probable that it would now receive a deliberate sanction; indeed there is good ground to infer the contrary, from such indications as modern opinions furnish. For in Yates vs. Boen, Strange’s Rep. 1104. in an action of debt upon articles, the defendant pleaded non eft factum, and offered to give lunacy in evidence. The Chief Justice first thought it ought not to be admitted, upon the rule that a man shall not stultisy for himself; but on the authority of Smith vs. Cau, where Chief Baron Penjelly in the like case admitted it, and on considering the case of Thompson vs. Leach, in 2 Ventris, 198. (reported also in 3 Mod. 301.) he suffered it to be given in evidence, and the plaintiff upon the evidence, was non-suited. These cases completely justify the assertion of Judge Blackstone, The same sentiment is avowed by Lord Mansfield in the House of Lords, in discussing a question brought up on a writ of error to one of the inferior courts. His language is equally forcible and apposite: “ It hath been “ said to be a maxim, that no man can plead “ his being a lunatic to avoid a deed executed, “ or excuse an act done at that time, because it “ is said, if he was a lunatic, he could not re-" member any action he did during the period of “ his insanity. And this was doctrine formerly “ laid down by some Judges; but I am glad to *507 “ find it hath since been exploded; for the reason “ for it is, in my opinion, wholly insufficient to “ support it; because though be could not remem- “ ber what passed during his insanity, yet he “ might justly say, if he even executed such a “ deed, or did such an action, it must have been “ during his confinement or lunacy; for he did “ not do it either before or since that time. As " to the case in which a man’s plea of insanity " was actually set aside, it was nothing more than “this: It was when they pleaded ore tenus; “ the man pleaded that at the time he was out of “ his senses. It was replied, how do you know “ you was out of your senses? No man that is “ so, knows himself to be so. And accordingly, " upon this quibble, his plea was set aside; not " because it was not a valid one, if he was out " of his senses, but because they concluded he " was not out of his senses. If he had alledged, " he was at that time confined, being apprehen- “ ded to be out of his senses, no advantage could “ have been taken to his manner of expressing “ himself.” Appen. Bl. 150.
Those who vindicate the maxim on the ground of public policy, seem to consider that the success of the plea depends on the testimony of the party relying upon it. But as it must be established by indifferent testimony, like any other fail, the truth is equally capable of being ascertained. And how flight fe the probability, either that men should feign lunacy, when they make contract, in order to avoid them afterwards; or if they were so disposed, that they could do it so successfully as to impose on the bye-standers! Supposing it to be assumed with a degree of plausibility calculated to deceive the witnessies, and *508 to impress them with a belief of its reality, the party contracting must then entertain the same opinion; and believing himself to be contracting with a person of unfound mind, he must have some dishonest views and ought not to receive the assistance of the law, in enforcing such a contract. But why enforce the contract of a real lunatic, left men should be tempted to feign lunacy, when even the former may be set aside by his committee, from the time he is found to have been non compos? The fact upon the inquisition, is not more deliberately examined, nor likely to be more accurately determined, than where it constitutes the defence of a suit, and must be tried by the jury. To ascertain the intentions of men, their actions must be resorted to in a multitude of instances; there is no other way of exploring tile operations of the heart. Whether the understanding be vitiated, seems to be a question upon which a jury may receive more complete satisfaction, than on many others presented to them where they have to mark the fine discrimination of intention. Insanity, it is true, may be assumed, while infancy and duress cannot: but the base probability that the deception should succeed, throughout all its stages, does not form a reason strong enough to sanction a principle so repugnant to natural justice.
The maxim then stands supported by various authorities, yet opposed by some that are very respectable, contained in the elementary books, as a principle of law; but the subject of reprobation with those by whom it is taught; rejected by individual Judges, before whom it has occurred, and treated with entire contempt by one of great eminence, in a most important juridical investigation *509 It may, at least, be drawn from this view of the subject, that the maxim ought not to be strained beyond its proper limits, to govern any case not falling within the letter. The case before the court is apprehended to be of that description; for the husband docs not seek to alledge the incapacity of his wife when sole, in order to annul a contract, by which he is personally bound, but one set up to repel a claim made by him as the representative of a deceased person. Such an act of the wife can bear no relation to the character in which the husband now appears, nor could insanity have been feigned by her with a view to enable the husband to escape from the contract now opposed to him. In this respect, therefore, the husband ought to be allowed to make any objections to the contract of the wife, which he might properly alledge against those of a stranger. And there seems to be as much propriety in this, as in a committee shewing the insanity of a lunatic in order to avoid his contrails. From these reasons, we are induced to think that the evidence offered by the husband, ought to have been received. As to the fecond question, it must be repeated, that the husband sues in another right, and can therefore be repelled only by transactions which have proceeded from him in that character. It is for the sake of preventing circuity of action that the law will not allow the recovery of a plaintiff against whom the defendant might afterwards effect a similar recovery. Wherever this principle operates, there will be found these two circumstances in the case, equality with regard to the amount and identity in respect of the character. As if a man covenant that he will not sue without any limitation of *510 time. This the law construes a defeazance or absolute release, in order to avoid circuity of action. For, if in such case, the party should, contrary to his covenant, sue, the other party would recover precisely the same damages which he sustained by the others suing. 4 Bac. 266. There the two circumstances concur; the covenant was given by the plaintiff in his proper character, in which also the suit was brought; and the recovery against him would have been measured by the amount of his against the covenantee. ' One of the ingredients occurs in the following case, which however being deficient in the other, was held for that reason not to amount to a bar. In an action of waste it is no bar that the plaintiff covenanted to repair; for, in waste, the plaintiff shall recover treble damages; in covenant, only single are recovered. Moore. 23. The principle is also illustrated in the following cases: If a feme obligee marries the obligor or one of the obligors; or if there be two feme obligees, and one of them marries the obligor; these are releases in law. But if a woman, executrix of the obligee, take the debtor to husband, this is no release in law, because the hath the debt in another right. 8 Co. 136. So in the present case, as the husband is suing for these negroes in another right, the acts of his wife before marriage ought not to prevent his recovery. It cannot, upon any principle of justice, be considered stronger against the husband, than if it were a debt of the wife’s contracted before marriage. Yet suing in the character of administrator such a debt could not be set up as a bar to the action; nor could even a debt of the husband's own contracting. 3 Atkyns. 691. And although the law *511 has established the general liability of the husband to the debts contracted by the wife when sole, yet there must be some acknowledgment on his own part, to render such a debt a bar even to an action brought in his own right, as the following case evinces, " This was an action of assumpsit for money, and goods sold and delivered. Plea, non assumpsit, with notice of sets off.
The articles contained in the sets off were three several sums of money, which were stated to have been paid by the defendant for the plaintiff, and by his direction; one of them was a sum of fix guineas, stated to have been paid to a Mrs.
Grandy, which the plaintiff’s wife who was a sister of the defendant, owed her for lodging before her intermarriage with the plaintiff. The counfel for the plaintiff objected to the allowance, of this sum in the present action, on the ground that this was an action by the husband alone, and the debt attempted to be set off was a debt due from the wife before marriage, for which the action should be against husband and wife. It was answered that the husband having ordered the money to be paid, had thereby made the debt his own. Eyre, C. J. said, " that for a debt of the wife dum fola, the action must be against husband and wife, and therefore could no be set off. against a claim, made by the husband alone, and for which the action was brought; but if it appeared that after the marriage, the husband had ordered the debt to be paid, he thereby made it his own, and it could be set off. The defendant proved that the husband had done so, and was allowed the sum in his set off.” 2 Efp. Cas. 594. The very principle employed to contest the plaintiffs *512 recovery, is the same which produced the several statutes relative to sets off, which, it is generally allowed, have extended the doctrine as far as the claims of justice require. Yet, whatever reasoning and analogy they furnish, is totally adverse to the grounds of defence set up in the present cafe.
The law will not, upon slight motives, suffer the course of administration to be impeded, which must happen, if the personal concerns of an administrator are taken into view, where he is collecting the property of his intestate, for the use of creditors and distributees. To countenance such a doctrine, by a decision of this court, would lead to consequences of the most unjust and injurious kind, and overturn the settled and well digested system, which has been handed down to us. Upon the second question therefore, our opinion is, that the husband is not barred by the warranty of his wife, under the circumstances of this case.

Hall, Judge, contra.

—-Two questions have been made in this case. 1ft. Is the plaintiff barred in this action, by the warranty of his wife while sole?-—2d. Ought the plaintiff to have been permitted to prove, on the trial, that his wife was non compos, &c. at the time she made the deed of gift to the defendant?
On the trial the inclination of my mind was, and still is, on both the points, with the defendant; yet I am not clear of doubts as to the first point. Whitehall vs. Squire, 2 Salk. 295. As to the second point, Powell on Contracts, 9, and the cases there cited.